UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re:  Case No. 16-11756-DHW
 Chapter 7
BENJAMIN J. FREEMAN,
ROBIN C. FREEMAN,

    Debtors.

## MEMORANDUM OPINION

Before the court is the bankruptcy administrator's motion to dismiss the debtors' chapter 7 case pursuant to 11 U.S.C. § 707(a) (Doc. #33). Joining the administrator in the motion are the trustee, William C. Carn, III, (Doc. #104 ) and Angie H. Ingram on behalf of herself, Wright Investments, LLC, Bowman Investments, Inc., Equity Partners, Inc., RK Investments, Inc., and Kent Ingram (Doc. #45).

On April 21, 2017, an evidentiary hearing was held in Dothan, Alabama. At the hearing, the debtors were represented by their attorneys J. Kaz Espy and Christopher K. Richardson. The bankruptcy administrator (hereinafter administrator) appeared through her counsel, Britt B. Griggs. Angie H. Ingram was represented by her attorney E. Glenn Waldrop, Jr. William C. Carn, III, the trustee, also appeared.

For the reasons that follow, the administrator's motion to dismiss will be denied.

### Jurisdiction

The court's jurisdiction in this contested matter is derived from 28 U.S.C. § 1334 and from an order of The United States District Court for this district wherein that court referred its title 11 jurisdiction to the Bankruptcy Court. *See* General Order of Reference [of] Bankruptcy Matters (M.D. Ala. April 25, 1985). Further, because this is a core proceeding pursuant to 28 U.S.C. § 157(b), this court's jurisdiction extends to the entry of a final order or judgment.

### Findings of Fact

The administrator and those joining in her motion contended that the debtors'

case should be dismissed due to a number of instances of bad faith on their part. Therefore, it may aid in the reader's understanding of this matter if the court's factual findings are arranged according to those particular instances of bad faith alleged by the administrator and those in joinder. However, before launching into a discussion of alleged instances of bad faith, a general backdrop of relevant facts may also enlighten the reader.

The debtors are both practicing lawyers. In the fall of 2014, the debtors were approached by Angie Ingram, also an attorney and coincidentally Ms. Freeman's aunt, concerning the debtors' interest in purchasing Ms. Ingram's law practice. Ms. Ingram's practice, which was located in Birmingham, Alabama, was primarily, if not exclusively, engaged in debt collections. That overture led to the debtors' purchase of Ms. Ingram's practice for about $1 million. The purchase was financed, in large part, by First Partners Bank through a Small Business Administration guaranteed loan.

The debtors' purchase of Ms. Ingram's law practice, however, was ill-fated. It began when Capital One, one of the practice's major clients, stopped referring new accounts to the law firm for collection work. That followed with Ms. Ingram, who continued to work for the firm after its sale to the debtors, leaving. Then, there was a lawsuit filed by the Freemans against Ms. Ingram in Jefferson County, Alabama. The complaint alleged, among other things, fraud in the sale of the practice. Ms. Ingram counterclaimed. In the late Spring of 2016, Capital One, which had earlier stopped referring new business to the practice, withdrew its old, existing accounts and gave that work to other law firms.

Mr. Freeman continued efforts to salvage the law practice. He associated with another collections attorney, Richard M. Breibart, and formed Breibart and Freeman law firm. In so doing, he was able to drastically cut many of the expenses of his former practice. For example, gone was the salary of Ms. Ingram. Gone too were the salaries other staff that were let go with work being shifted to Breibart employees. In addition, the cost of office space rental was eliminated in that the practice was moved into the offices of Breibart. Mr. Freeman's hope was that the practice could survive as a result of these reduced expenses and by aggressively working the firm's remaining client accounts. Indeed, the First Partners Bank loan was fully serviced through April 2016, and a partial payment was made on the note in May 2016.

Mr. Freeman had ongoing discussions with First Partners Bank concerning the difficulties the firm was having in servicing the debt due to the loss of the Capital

One business. As Mr. Freeman described it, the parties were looking for "ways to bridge the gap." In spite of these efforts, in July of 2016, First Partners Bank informed Mr. Freeman that, in order to preserve the SBA guarantees, it (the Bank) would be required to bring suit against the Freemans on their personal guarantees of the firm's indebtedness. This, according to Freeman, prevented any work-out of the firm's financial troubles, and also, precipitated the debtors' bankruptcy.

Having given these background facts, the court now turns to those facts relating to the debtors' alleged bad faith.

**I. The debtors have not made lifestyle adjustments and have continued to live lavishly. Should such adjustments be made, a substantial portion of the debtors' unsecured debt could be paid.**

The administrator's contention that the debtors' bad faith is evidenced by their failure to make lifestyle adjustments focused on four primary actions by the debtors: a) their purchase of a large home and installation of a swimming pool on that property; b) their entering into reaffirmation agreements by which the debtors are retaining unnecessary and luxury properties; c) their continuing to incur private school tuition for two of their children; d) their incurring unnecessary expenses for dining out. The court will discuss each of these actions by the debtors in turn.

a) The Headland home and swimming pool

The debtors formerly owned a home in Columbia, Alabama, which they purchased in 2003. In April 2014, the debtors listed the Columbia home for sale for $195,000. Also, in 2014, the debtors purchased a four and one-half acre lot in Ashford, Alabama, with the intention of building a home there once the Columbia home sold.

For many months, the debtors did not receive any offers to purchase the Columbia home. Finally, in October 2015, an offer of $190,000 to purchase the property was received and accepted. The $190,000 sales price, however, was not enough to pay off existing mortgages. Therefore, the debtors borrowed the necessary funds in order to satisfy mortgages at closing that would have been unpaid due to the short sale.

Following the sale of the Columbia property, the debtors moved into a small, modified pole barn where they resided for about six months. By this time, the private school that two of their children attended had closed, and their children were

enrolled in another private school some thirty miles from Ashford. Therefore, the debtors abandoned their plan to build on the Ashford lot. Instead, in February 2016, the debtors bought a home in Headland, Alabama, for $334,000. Headland is about ten miles from the children's school and from the debtors' work.

In connection with the debtors' purchase of the Headland home, but before the closing on that transaction, they contracted with Hughes Pools for the installation of a pool on the Headland property for $29,187. Mr. Freeman testified that the party financing the Headland home initially gave conditional approval to include the pool purchase and installation as a part of the overall financing. Later, however, the pool cost was not included in the financing due to the appraised value to debt restriction for the lender. By this time, Hughes Pools had completed the pool installation. Therefore, the debtors agreed to grant Hughes Pools a mechanic/materialman lien on the Headland home.

As noted, the administrator contended that selling one home at a short sale and soon thereafter, buying a more expensive home with a pool is a badge of the debtors' bad faith. The debtors, however, rebutted the bad faith contention. First, they testified that the mortgage payment on their Columbia home was approximately $1,200 a month compared to a payment on the Headland property of around $1,800 per month. The debtors testified that this difference of about $600 was almost completely offset by savings that the Headland property afforded. Those savings were realized in reduced transportation expenses due to the property's proximity to their children's school and to their work. Savings were also achieved in reduced electric and gas utility expenses that the more efficient Headland property provided. Further, the Headland property had its own water well and, as a result, there was no utility expense for water services. All-in-all, the debtors maintained that their housing in Headland was no more expensive than what they paid to live in Columbia.

b) Reaffirmation of unnecessary debts

According to the administrator, the debtors entered into a number of reaffirmation agreements in order to retain property which is either unnecessary or extravagant. In the administrator's view, future funds to service these reaffirmed debts should be directed toward payment of the debtors' unsecured claims.

The debtors filed reaffirmation agreements reaffirming a total debt of approximately $577,000. Going forward, the monthly debt service on these reaffirmed debts totals about $5,000.

In particular, the debtors reaffirmed a debt to Peoples South Bank secured by the unimproved four and one-half acre lot in Ashford. The debt service on this debt going forward is $305 each month. The debtors offered no explanation as to why they wanted to retain this property.

The debtors reaffirmed a debt to Alabama Ag Credit which is secured by 80 acres of farm land in Georgia. Going forward, the debtors will have to expend about $450 per month to service this claim. Mr. Freeman testified that he wanted to retain this property due, in part, to its sentimental value and, in part, to honor a commitment to his brother. Mr. Freeman's brother is making one-half of the monthly payment to Alabama Ag Credit. Although the brother is not a record owner of the property, he has a tacit agreement with the debtors that they will convey the brother a one-half interest in the Georgia property once the debt on the property is satisfied.

They reaffirmed a debt to Sheffield Financial secured by a 2014 Kawasaki UTV, a recreational vehicle, which obligated them to a payment of $326 per month going forward. Mr. Freeman testified that his family farmland was very swampy and that the UTV was the only practical means to access that property.

The debtors reaffirmed their obligation to Cenlar FSB on their Headland home. The monthly payment on this debt is approximately $1,843.

The debtors reaffirmed three separate debts to Tyndall Federal Credit Union each secured by a vehicle. The debt service obligation going forward to Tyndall Federal Credit Union for these three debts is $1,843 per month. One of the vehicles is a 2014 Mercedes Benz, on which the debt is approximately $80,000 and another is a 2012 Jeep Wrangler that was purchased in the Spring of 2016, just a few months before this bankruptcy was filed. Mr. Freeman testified concerning the Mercedes and acknowledged that the debt on that vehicle was large. Nevertheless, he explained that the debt was not reflective of the initial cost of the vehicle. Mr. Freeman explained that he traded-in a Nissan Pathfinder for the Mercedes and that the Pathfinder was worth considerably less than he owed on it. Therefore, the financing of the Mercedes included the negative equity for the Pathfinder. Hence, the current amount owed on the Mercedes does not reflect the initial cost of that vehicle. In short, the Mercedes was not nearly as costly as the debt owed on it would imply.

With regard to the Jeep Wrangler, Mr. Freeman acknowledged that the vehicle was purchased a few months before the bankruptcy. He, however, denied that the purchase was in any way lavish or knowingly made on the brink of his financial

demise. Instead, Mr. Freeman contended that he purchased the Jeep Wrangler out of necessity when his son totaled his vehicle in an accident. Following the accident, Mr. Freeman allowed his son drive his 2005 Ford truck, and Mr. Freeman bought the Jeep Wrangler for his own use. At the time of purchase, the Jeep Wrangler was a four-year old, used vehicle with approximately 80,000 miles.

Finally, with regard to the reaffirmation of the Tyndall Federal Credit Union debts, the debtors testified that they believed that they had no alternative but to do so. These three debts are all cross-collateralized; each vehicle standing as security for each of the three debts. Further, the credit union has a policy of reaffirming only if all debts owed by the debtors were also reaffirmed. According to the debtors, having transportation is a necessity for their family. Having transportation, in light of the credit union's policy toward reaffirmation, meant that they had to reaffirm all three vehicle debts, including the Mercedes which is worth considerably less than they owe on it.

While there is no formal reaffirmation of the roughly $13,000 debt to Hughes Pools, the debtors entered into a consent order with Hughes Pools which gave that creditor a mechanic or materialman lien on their Headland home. The evidence did not establish the amount of the monthly debt service attributable to the Hughes Pools obligation. Nevertheless, the debtors explained that their home is in a rural area where entertainment opportunities for their children are limited. The pool represents a major component of the children's recreation.

  c. Continuing private school tuition expenses

The debtors pay private school tuition of $1,138 each month for two of their children. The administrator contended that it is a sign of the debtors' bad faith that they continue to do so.

The debtors maintained that the decision to send their children to private school was faith-based and that having their children educated in a Christian environment is important to their family values. The debtors have reduced their outlay for the education of their children. Their son, who was a student at Auburn University, has enrolled in a local commuter school and lives at home with his parents.

  d. Continuing unnecessary practice of dining out too often

The administrator contended the debtors' unwillingness to make lifestyle

changes in order to pay debts is shown by their $390 a month budgeted expense for so-called work lunches. The debtors responded that, due to the distance their workplaces are from their home, dining out at lunch is their only reasonable option.

## II. The debtors continued incurring debt upon the eve of bankruptcy.

The administrator's second contention evidencing the debtors' bad faith was premised on their making large purchases within months of filing for bankruptcy relief. First, the administrator pointed to the February 2016 purchase of the $334,000 Headland home and subsequent installation of a swimming pool at that property. The implication is that the debtors knew or should have known of their impending bankruptcy and thus, incurred the property and the associated debts in bad faith.

The debtors, however, insisted that they were unaware of the severity of their financial situation when they purchased the Headland property. As noted earlier, Mr. Freeman was aware that one of his law firm's major clients, Capital One, was no longer placing new accounts with the firm. Nevertheless, Mr. Freeman took action in an effort to make that practice successful. For example, he merged the law practice with that of another collections attorney, he reduced the firm's expenses by eliminating the salaries of Ms. Ingram and other support staff, and he eliminated rental expense by moving into the Breibart offices. Further, Mr. Freeman engaged in protracted discussions with the firm's primary lender, First Partners Bank, regarding means by which the gap created by the loss of the Capital One account could be filled. Then, in July 2016, First Partners Bank informed Mr. Freeman that, in order to preserve the SBA guarantee, the Bank was required to sue the Freemans personally on their guaranty of the firm's debt. It was then, and only then, that the debtors realized that bankruptcy was eminent.

That the debtors were unaware of their impending bankruptcy is bolstered by the fact that in the Spring of 2016, Tom Freeman, the debtor's father, borrowed $50,000 to infuse into the debtors' law practice. Benjamin Freeman testified that he would not have allowed his father to make that contribution of capital had he believed that bankruptcy would ensue.

Secondly, the administrator contended that the debtors' purchase of a 2012 Jeep Wrangler in April 2016 shortly before filing bankruptcy is another example of their bad faith. In addition to the debtors' position that they did not anticipate a bankruptcy in April 2016, they defended their purchase of the Jeep on other grounds. The Freeman's son was involved in an automobile accident in early April 2016, and

his vehicle was totaled in the wreck. Thereafter, Mr. Freeman purchased the Jeep for his own use and allowed his son to use a 2005 Ford truck. Further, the Freemans noted that the Jeep was four-years old at the time it was purchased and had over 80,000 miles; hardly an extravagant purchase.

**III. The debtors, in their bankruptcy schedules, made omissions or misrepresentations of their financial situation.**

The administrator maintained that the debtors' bad faith is evidenced by omissions or misrepresentations made during the course of the bankruptcy proceeding.

The first alleged omission or misrepresentation involved the scheduling of an interest in Breibart and Freeman, LLC. Originally, the Breibart and Freeman, LLC interest was not disclosed. However, the schedules were amended shortly after the creditors' meeting to disclose that interest. Further, Mr. Freeman testified that all income received from Breibart and Freeman was paid to Mr. Freeman's professional corporation through which he practiced law in the Dothan area. All of that income, according to Mr. Freeman, was included and accounted for in the original bankruptcy schedules.

The second alleged omission or misrepresentation concerned Mr. Freeman's statement of his income. In the bankruptcy schedules, Mr. Freeman showed his income to be $7,819 per month. However, at the hearing, Mr. Freeman testified that his income is approximately $8,400 per month. He was able, however, to account for this difference between his schedules and his testimony. Mr. Freeman noted that all income was paid to his professional corporation. Then, he was paid from the professional corporation only after the expenses of the corporation were paid. In short, the difference between the higher income presented by way of his testimony is reconciled with the lower, scheduled income by allowing for the professional corporation's overhead.

**IV. The debtors are paying debts to insiders.**

As another sign of bad faith, the administrator noted that both debtors are paying debts to their mothers. The debtors obtained personal loans from each of their mothers pre-petition. The debtors pay $200 a month on a $20,000 loan to Mrs. Freeman's mother, Cheryl Holland. Mr. Freeman's mother, Rhonda Freeman, is paid $663 a month to service a $9,000 loan. The debtors have continued to make these payments post-petition.

Mrs. Freeman testified that her mother lives on a fixed income and relies on the $200 a month in order to get by. Because Cheryl Holland depends on the monthly $200 payment, Mrs. Freeman feels that she has a moral obligation to assist her needy mother whether in the form of debt repayment or by way of gift.

**V. The debtors filed bankruptcy in response to a judgment or collection action and in an effort to avoid a large, single debt.**

The administrator contended that the debtors' bad faith is shown by their filing bankruptcy in response to a collection action in an effort to avoid a large, single debt of First Partners Bank. The debtors admitted that the Bank's decision to sue them under their personal guarantee precipitated bankruptcy.

The debtors, however, disputed that their bankruptcy was an effort to avoid and frustrate a single, large creditor. Indeed, a review of the debtors' schedule of debts reflects that they owe creditors over $1.5 million. Of that amount, First Partners Bank is owed approximately $700,000, an amount less than one-half of their total debt. Further, there was no evidence that the debtors acted improperly to frustrate First Partners Banks efforts to collect.

Conclusions of Law

The Bankruptcy Code provides for the dismissal of a chapter 7 bankruptcy case for cause. The Code provides:

a) The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including–
   1) unreasonable delay by the debtor that is prejudicial to creditors;
   2) nonpayment of any fees or charges required under chapter 123 of title 28; and
   3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on motion by the United States Trustee.

11 U.S.C. § 707(a). The three listed examples of cause for dismissal enumerated in the statute are illustrative and not exhaustive. *See In re Piazza*, 719 F.3d 1253, 1261 (11th Cir. 2013) (citing 11 U.S.C. 102(3) wherein the word "including" for

Bankruptcy Code purposes is defined as "not limiting").

While the term "for cause" is not defined by the Bankruptcy Code, a debtor's "prepetition bad faith unquestionably constitutes adequate or sufficient reason to dismiss a Chapter 7 petition. Hence, ... the 'for cause' language of § 707(a) permits involuntary dismissal upon a finding that the debtor's petition was filed in bad faith." *In re Piazza*, 719 F.3d at 1271.

"The decision to dismiss a petition for lack of good faith rests within the sound discretion of the bankruptcy court." *Albany partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 674 (11th Cir. 1984).

> "In light of its inherently discretionary nature, a totality-of-the-circumstances approach is the correct legal standard for determining bad faith under § 707(a). The totality-of-the-circumstances inquiry looks for atypical conduct, that falls short of the honest and forthright invocation of the Bankruptcy Code's protections. In making that determination, bankruptcy courts must, as they so often do, sift the circumstances surround a claim to see that injustice or unfairness is not done. Under this inquiry, bad faith is ultimately evidenced by the debtor's deliberate acts or omissions that constitute a misuse or abuse of the provisions, purpose, or spirit of the Bankruptcy Code."

*In re Piazza*, 719 F.3d at 1271-72 (citations, quotations, and brackets omitted).

As the movant, the administrator bears the burden of showing cause for dismissal under § 707(a). *In re Piazza*, 719 F.3d at 1266; *In re Simmons*, 200 F.3d 738, 743 (11th Cir. 2000); *In re Uche*, 555 B.R. 57, 60 (Bankr. M.D. Fla. 2016). In her effort to carry that burden, the administrator presented her case here around the list of factors set out in *In re Baird*, 456 B.R. 112 (Bankr. M.D. Fla. 2010). In *Baird,* the court enumerated a list of 15 factors that courts should consider in determining debtor's bad faith under the totality-of-the-circumstances standard.[1] In affirming

---

[1] *In re Baird* bad faith factors:

> (i) the debtor reduced his creditors to a single creditor shortly before the petition date;
> (ii) the debtor made no life-style adjustments or continued living a lavish life-style;
> (iii) the debtor filed the case in response to a judgment, pending litigation, or

the bankruptcy court's holding in *Piazza*, where the bankruptcy judge relied upon the *Baird* factors, the court of appeals declined to adopt the factors considered but found that the bankruptcy court did not commit reversible error. *In re Piazza*, 719 F.3d at 1272. In the case *sub judice*, the administrator contended that the debtors' bad faith is evidenced by their 1) failure to make life-style changes and continuation of lavish living that prevents their ability to pay unsecured debts; 2) incurrence of debts on the eve of bankruptcy; 3) making omissions and misrepresentations within their bankruptcy schedules; 4) continuation of payments of debts to insiders; and 5) filing bankruptcy in response to a collection action by a large, single creditor.

Before addressing these *Baird* factors as they relate to this case, the undersigned notes that other courts have taken a dim view of a mechanical, factor driven approach in making bad faith determinations. For example, Judge Kimball in *Kane & Kane* wrote:

> In an effort to focus the bad faith analysis, reported decisions point to various factors that tend to support or negate a debtor's alleged bad faith. These factors are helpful only to a point. The circumstances of each debtor are unique, and the proper weight given to each fact necessarily depends on all of the other facts presented. A list of factors provides only the appearance of a reliable test. It implies a scientific or

---

collection action;
(iv) there is an intent to avoid a large, single debt;
(v) the debtor made no effort to repay his debts;
(vi) the unfairness of the use of Chapter 7;
(vii) the debtor has sufficient resources to pay his debts;
(viii) the debtor is paying debts of insiders;
(ix) the schedules inflate expenses to disguise financial well-being;
(x) the debtor transferred assets;
(xi) the debtor is over-utilizing the protections of the Bankruptcy Code to the unconscionable detriment of creditors;
(xii) the debtor employed a deliberate and persistent pattern of evading a single major creditor;
(xiii) the debtor failed to make candid and full disclosure;
(xiv) the debtor's debts are modest in relation to his assets and income; and
(xv) there are multiple bankruptcy filings or other procedural "gymnastics."

*In re Baird*, 456 B.R. 112, 116–17 (Bankr. M.D. Fla. 2010).

mathematical certainty in the analysis, which it most certainly lacks.

Many of the factors relied on by the courts in determining whether a debtor acted in bad faith in filing a petition find their genesis in decisions considering dismissal in the context of Chapter 11 and Chapter 13 cases. These factors have less and perhaps no weight in the Chapter 7 context. A Chapter 7 debtor's powers and duties under the Bankruptcy Code, its relationship with its creditors, and the overall nature of a Chapter 7 liquidation case, materially differ from a Chapter 11 or Chapter 13 case.

*In re Kane & Kane*, 406 B.R. 163, 167 (Bankr. S.D. Fla. 2009). Another Florida bankruptcy court added "[r]eliance on a multifactor test to establish bad faith as cause for dismissal is particularly troubling where many of the factors go to a debtor's ability to pay his debts." *In re Uche*, 555 B.R. 57, 61 (Bankr. M.D. Fla. 2016). Recognizing the difficulty in applying a mechanical, factor driven test to determine good faith, the court, nevertheless, now turns to the *Baird* factors raised by the administrator in this case.

**I. Debtors' failed to make lifestyle changes or adjust their lavish lifestyle. If debtors made such modifications, a significant portion of their unsecured debts could be paid.**

The administrator complained that the debtors sold a home, at a short sale, and then, purchased a more expensive home within a few months of their filing bankruptcy. The undersigned, however, is not convinced that the sale of one home some two years prior to bankruptcy and the purchase of a more expensive home within months of bankruptcy show bad faith on the debtors' part. As noted, the sale of the debtors' Columbia home took place about two years prior to their bankruptcy and prior to the debtors experiencing financial problems.

Neither does the debtors' purchase of the Headland home and their installation of a swimming pool show their bad faith. As they explained, the mortgage payment on the Headland home was some $600 per month higher than the payment on the Columbia home mortgage. However, that difference was absorbed by savings generated as a result of lower utility and transportation expenses. As to the installation of a swimming pool at the Headland home, the court can find no badge of bad faith there. Headland is situated in a rural area with little recreational opportunities for children. The installation of a swimming pool for their children's entertainment was not unreasonable under the circumstances. This is particularly

true when, at the time of the pool installation, the debtors did not unreasonably ignore their impending financial demise.

Secondly, the administrator complained that the debtors are unnecessarily reaffirming debts that obligate them to monthly payments of about $5,000. If eliminated, the administrator maintained that these payments could be redirected to payment of unsecured debts.

Yet, complete elimination of the reaffirmations is unrealistic. For example, should the debtors not reaffirm the mortgage debt on their home, they would, nevertheless, have to incur an expense for other housing accommodations. Likewise, if the debtors forewent their reaffirmations of debts securing their vehicles, they, nonetheless, would have to incur some other expense for transportation. Therefore, foregoing reaffirmation of debts does not translate into a dollar-for-dollar payment to unsecured creditors.

Next, the administrator complained of the debtors' reaffirmation of the debt secured by the four and one-half acre, unimproved lot in Ashford, the debt secured by the Georgia farm land, and the debt secured by the Kawasaki UTV. The court acknowledges that the reaffirmations of these debts are more problematic with regard to the debtors' bad faith. However, viewing each in light of the totality of circumstances, the court cannot find bad faith on the debtors' part as a consequence. Further, the court notes that the monthly debt service on these three reaffirmations is approximately $1,000 per month. The debtors' unsecured claims total around $1.5 million. Hence, payment of $1,000 per month would be a de minimis return to unsecured creditors.

The administrator also contended that the debtors are maintaining a lavish lifestyle by paying approximately $1,100 per month for their children's private school tuition and by their continued practice of eating out for lunches at a cost of about $400. The debtors explained their desire to continue their children's Christian based education and to not disrupt their children by requiring them to change schools. In the view of the undersigned, this is not atypical behavior on the part of the debtors such as should deny them relief in chapter 7. Neither is their practice of eating out for lunch. Both debtors work in Dothan, Alabama, which is some distance from their home. To require them to travel to their home for lunch would be counterproductive in that the cost of travel would likely equal or exceed the cost of dining out.

Finally, even if the debtors' could afford to pay a significant amount of their

unsecured claims, which here they cannot, failure to do so would not, in and of itself, represent bad faith.  In this regard, one Florida bankruptcy court observed:

> Indeed, a dismissal based upon a debtor's ability to pay is expressly prohibited by the legislative history of Section 707(a).  In enacting Section 707(a), Congress unequivocally stated that the Section does not contemplate, however, that the ability of the debtor to repay his debts in whole or in part constitutes adequate cause for dismissal.  This stands in stark contrast to Section 707(b), which provides a mechanism for dismissal of a Chapter 7 case where the debts at issue are primarily consumer debts.

*In re Uche*, 555 B.R. 57, 61-62 (Bankr. M.D. Fla 2016) (quotation marks and brackets omitted).

Considering all of the circumstances, the court cannot find bad faith by these debtors under this first *Baird* factor raised by the administrator.  In short, the court is unable to find any atypical conduct by these debtors in retaining their present home and vehicles, in their paying private school tuition, in their incurring lunch dining expenses, or in their reaffirmation of debts that should deny them relief under chapter 7 as a result of their bad faith.

## II.  Debtors' incurrence of debts on the eve of bankruptcy.

The administrator complained that the debtors' bad faith is evidenced by their continued incurrence of debts on the eve of bankruptcy.  She pointed to two specific examples; the purchase of the debtors' Headland home and their purchase of a Jeep Wrangler.

Regarding the Headland home, as earlier noted, the debtors bought the property in early 2016 a few months before their bankruptcy.  That purchase, however, had its beginnings over two years prior, when the debtors sold their home in Columbia.  After that sale, the debtors lived in a pole barn until they could find another home.  In short, the purchase of the Headland home was the mere culmination of a plan that they had begun about two years prior.  In addition, there was no persuasive evidence that the debtor**s** were contemplating bankruptcy when they bought the Headland home.  In the view of the court, the debtors did not realize that bankruptcy was eminent until the Summer of 2016.

As to their purchase of the Jeep Wrangler in April 2016, the transaction was

one of necessity rather than an optional purchase.  As noted, the debtors' college aged son was involved in an accident in which his vehicle was destroyed.  As a result, the debtors purchased the roughly four-year old Jeep, which had around 80,000 miles, for Mr. Freeman's use, and allowed their son to drive the truck formerly driven by Mr. Freeman.  The purchase of the used Jeep can hardly be described as extravagant or unnecessary.

Although these two purchases occurred within months of the debtors' bankruptcy, in looking at the totality of the facts surrounding these transactions, the undersigned cannot find any atypical conduct by these debtors with regard to these eve of bankruptcy purchases that should result in their denial of chapter 7 relief.

### III.  Debtors' omissions and misrepresentations in their bankruptcy schedules.

The administrator contended that the debtors were not forthcoming with respect to their bankruptcy proceeding.  First, she contended that the debtors omitted any mention of their interest in the law firm Breibart and Freeman in the schedules accompanying their bankruptcy petition.  Further, the administrator claimed that the debtors, Mr. Freeman in particular, misstated income.  Both instances are somewhat related.

It is true that the debtors' interest in the law firm Breibart and Freeman was not mentioned in their original schedules.  However, debtors amended the schedules shortly after the meeting of creditors to disclose that interest.

With regard to Mr. Freeman's scheduled income, all of the income that he received from Breibart and Freeman was included in the total amount reported in the schedules.  That amount was paid originally to Mr. Freeman's professional corporation, and ultimately from the professional corporation to Mr. Freeman.  Of course, the amount paid to Mr. Freeman from his professional corporation was less than the gross receipts in that the professional corporation retained amounts necessary to defray its own overhead.  Therefore, Mr. Freeman was able to reconcile the amount reported in the bankruptcy schedules as his personal income with his testimony regarding his professional corporation's gross receipts.

With regard to omissions or misrepresentations made by the debtors, the court notes that the omission was timely cured and that there were no intentional misrepresentations made by the debtors in connection with their bankruptcy proceeding.  It follows, that this *Baird* factor cannot form the basis for a finding of

debtors' bad faith so as to deny them relief in chapter 7.

### IV. Debtors' payment of debts to insiders.

The administrator contended that the debtors' payment of debts to insiders, their mothers, is a sign of their bad faith. Again, the court disagrees.

The two loans that the debtors are repaying to their mothers total $29,000. They pay about $863 per month on the two loans. Of this amount, $200 per month is paid to Cheryl Holland, Ms. Freeman's mother. Ms. Freeman testified that her mother has a very limited income and relies on the monthly loan payment from the Freemans to meet her living expenses. Whether they assist Ms. Holland by repaying their debt to her or by the making of a gift, the Freemans feel morally obligated to assist Ms. Holland in dealing with her own financial situation.

Due to the relatively small amount of debt being repaid to their parents and finding nothing atypical in their conduct with regard to the payment of those debts, the court cannot find bad faith here sufficient to deny the debtors relief under chapter 7.

### V. The debtors have filed bankruptcy in response to a judgment or collection action and in an effort to avoid a large, single debt.

The administrator contended that the debtors' bad faith is shown by their filing bankruptcy to avoid the collection action by First Partners Bank, the holder of a large, single debt. The court disagrees on a number of points.

First, while the debtors admitted that the First Partners Bank law suit precipitated their bankruptcy, they did not file bankruptcy to frivolously frustrate the Bank in its efforts to collect. Instead, it is clear that the bankruptcy was filed due to the reality of their financial condition.

Secondly, First Partners Bank is not the debtors' only creditor. In fact, First Partners Bank is owed about one-half of the debtors' roughly $1.5 million in total debt. So, it is fair to say that the debtors did not file bankruptcy to frustrate the collection efforts of a single creditor.

Finally, the court notes that this factor of the *Baird* good faith list is the least compelling. One court noted:

> Almost every bankruptcy case is filed because a creditor is pursuing a debtor, whether it be calls from debt collectors, repossessions, suits on unsecured debt, or residential foreclosures. Indeed, if filing bankruptcy to avoid the payment of a debt was cause for dismissal, no debtor would ever be able file a bankruptcy case. Here, the Medical Practice made payments toward the mortgage for more than two years before defaulting and continued making payments even after the default. It cannot, therefore, reasonably be said that the Debtor made no effort to repay the debt.

*In re Uche*, 555 B.R. 57, 62–63 (Bankr. M.D. Fla. 2016) (internal quotation marks omitted). There is little doubt that the First Partners Bank suit was the straw that broke the debtors' financial backs sending them to bankruptcy. The debtors, however, did not file bankruptcy in an effort to frustrate the Bank's collection attempts. Instead, bankruptcy was the debtors' response to a failed business venture, the ill-fated collections practice, and debts of $1.5 million that they lacked the ability to repay. Accordingly, the court cannot find bad faith on this ground.

## Conclusion

For the foregoing reasons, the administrator's motion will be denied. A separate order will enter accordingly.

Done this the 11th day of May, 2017.

*/s/ Dwight A. Williams, Jr.*
Dwight H. Williams, Jr.
United States Bankruptcy Judge

c: Debtors
J. Kaz Espy, Attorney for the Debtors
Christopher K. Richardson, Attorney for the Debtors
Bankruptcy Administrator
Angie H. Ingram, Creditor
E. Glenn Waldrop, Jr., Attorney for Angie Ingram
William C. Carn, III, Trustee